UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BRIAN M. DAVIS,                                CIVIL NO. 16-2832 (DTS)

    Plaintiff,

v.                                             <u>ORDER AND MEMORANDUM</u>

NANCY A. BERRYHILL,
*Acting Commissioner of Social Security,*

    Defendant.

---

Ethel Schaen, Esq., 1821 University Avenue #344 South, St. Paul, MN 55104, and Eddy Pierre Pierre, Esq., Law Offices of Charles E. Binder and Harry J. Binder, LLP, 60 East 42nd Street #520, New York, NY 10165, for plaintiff

Pamela A. Marentette, Assistant U.S. Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for defendant

---

Brian M. Davis appeals the Commissioner of Social Security's denial of his application for children's insurance benefits (CIB) and supplemental security income (SSI) benefits. Docket No. 1. This matter is before the Court on the parties' cross-motions for summary judgment. Local Rule 7.2(c)(1); Docket Nos. 14, 18. No hearing was held. Docket No. 23. For the reasons stated below, the Court grants Davis's motion for summary judgment and remands the case to the Administrative Law Judge (ALJ) for further consideration consistent with this opinion.

**MEMORANDUM**

**1.     ALJ DECISION**

The Commissioner uses a five-step sequential evaluation process to determine whether a claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(a). The Commissioner evaluates "(1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is, or approximates, a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Brock v. Astrue*, 674 F.3d 1062, 1064 n.1 (8th Cir. 2012); *see also* 20 C.F.R. § 404.1520(a)(4).

The ALJ issued his decision on March 12, 2015. In steps one through three, he found that Davis has not engaged in substantial gainful activity; has several severe impairments – schizophrenia, major depression, obsessive compulsive disorder, anxiety, ADHD, borderline intellectual functioning, degenerative changes in the cervical spine, and back pain – that did not meet or medically equal any listed impairment; and has the residual functional capacity (RFC) to perform medium work with limitations. R. 18-25.[1] At step four the ALJ found that Davis has no past relevant work ("PRW"). R. 26. At step five, the ALJ found that Davis could perform jobs that exist in significant numbers in the national economy, such as hand packager and package sealer/machine tender, and thus concluded he was not disabled. R. 26-27.

**2.     STANDARD OF REVIEW**

The Commissioner's denial of disability benefits is subject to judicial review. 42 U.S.C. §§ 405(g), 1383(c)(3). This Court has authority to "enter, upon the pleadings

---

[1] The abbreviation "R." refers to the Administrative Record. Docket No. 12.

and transcript of the record, a judgment affirming, modifying or reversing a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.* § 405(g) (sentence four).

Disability under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). Under the regulations, disability means that the impairment(s) is/are so severe that the claimant is not only unable to engage in previous work, but cannot engage in any other kind of substantial gainful employment that exists in the national economy. *Id.* § 423(d)(2)(A).

This Court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Telkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). On review, the Court considers "both evidence that detracts from and evidence that supports the Commissioner's decision." *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004). If it is possible, based on the evidence in the record, to reach two inconsistent decisions, and one of those decisions is the Commissioner's position, the decision must be affirmed. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). In other words, the denial of benefits will not be disturbed "so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the reviewing court] might have reached

a different conclusion had [it] been the initial trier of fact." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008); *see also Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988) ("The concept of substantial evidence . . . embodies a zone of choice within which the Secretary may grant or deny benefits without being subject to reversal on appeal.").

The claimant bears the burden of proving entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n. 5 (8th Cir. 2000). Once the claimant demonstrates that he or she cannot perform past work due to a disability, the burden "shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

**3.   ANALYSIS**

   **a.   Listing 12.05C[2]**

Davis contends that he is disabled because his mental limitations satisfy the requirements of Listing 12.05C.[3] "Listing 12.05C requires: 1) 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22,' 2) '[a] valid verbal, performance, or full scale IQ of 60 through 70,' and 3) 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'" *Scott v. Berryhill*, 855 F.3d 853, 856 (8th Cir. 2017) (quoting 20 C.F. R. Pt. 404, Subpt. P, App. 1, § 12.05C (2013)).

---

[2] The Social Security Administration revised and reorganized Listing 12.05 ("Intellectual Disorder"), effective in 2017. The requirements are now encompassed in two paragraphs, so there is no longer a paragraph "12.05C."

[3] Davis does not dispute the physical limitations found by the ALJ. *See* Davis Br. 2 n.3, Docket No. 15.

4

Davis states that the ALJ erred at step three in failing to consider Listing 12.05. The Commissioner admits that the ALJ did not mention Listing 12.05 but states that any error in failing to do so was harmless because substantial evidence supports a finding that Davis did not satisfy its requirements. Specifically, the Commissioner contends that the record establishes that Davis did not have the required "deficits in adaptive functioning" under Listing 12.05, pointing to the ALJ's findings that Davis had mild restrictions in daily activities and moderate restrictions in social functioning and concentration, persistence or pace. *See* R. 19-20, 24.

The Court concludes that it was error not to consider Listing 12.05 and that this case must be remanded. Although the ALJ stated his reasons for finding that Davis's impairments did not satisfy psychiatric Listings 12.02, 12.03, 12.04, and 12.06 [R. 19-21], he did not consider 12.05 which has a separate set of requirements. In addition, as discussed below, the Court finds that the ALJ made errors in evaluating the record and the opinion evidence and that the errors were not harmless because the record does not otherwise support the ALJ's conclusion. *See Igo v. Colvin*, 839 F.3d 724, 728-29 (8th Cir. 2016) (failure to identify and analyze the appropriate listing may not be reversible error so long as substantial evidence in the record supports the ALJ's determination). Listing 12.05 must be analyzed according to its own terms, based upon an examination of the record as a whole and consistent with this Order and Memorandum. Therefore, the Court remands this case to the ALJ for consideration of whether Davis has satisfied the requirements of Listing 12.05.

### b. Treating Psychiatrist's Opinion

The ALJ erred in evaluating and discounting the opinions of treating psychiatrist Dr. Sushila Mohan. In making a disability determination, an ALJ considers evidence that includes "medical opinion" evidence of the claimant's "impairment-related limitations or restrictions." 20 C.F.R. § 416.913(a)(2). Such limitations include the claimant's "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions" and "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." *Id.* § 416.913(a)(2)(i)(A) and (B).

A treating physician's opinion should be given controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *Id.* § 404.1527(c)(2); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002). The record must be evaluated as a whole to determine whether the treating physician's opinion should control. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009). The ALJ must always give "good reasons" for the weight afforded to the treating source's opinion. *Id.* at 680; 20 C.F.R. § 404.1527(c)(2).

The ALJ rejected Dr. Mohan's diagnosis of mild mental retardation, stating that it was not supported by "objective findings" or a "diagnostic test" and that "the records . . . support that [Davis] was capable of working in skilled-type jobs, which supports that he does not have mild mental retardation." R. 24. These statements are incorrect.

6

First, Dr. Mohan's diagnosis of mild mental retardation – "significantly subaverage general intellectual functioning" under Listing 12.05 – is supported by testing administered by psychologist Dr. Michael Hamberg.  Dr. Mohan began treating Davis on July 30, 2012.  R. 566, 809.  Between August 10-16, 2012, upon a referral by Dr. Mohan, Dr. Hamberg administered several tests to Davis, including the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) which resulted in a Full Scale IQ (FSIQ) score of 65.  R. 544, 810-20.  The Social Security Administration (SSA) has stated, "In our experience, full scale IQ scores are the most reliable evidence that a person has intellectual disability and not another impairment that affects cognition." Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,151 (Sept. 26, 2016).  A person's IQ is presumed to remain stable over time unless there is evidence of a change in the person's intellectual functioning.  *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006).

Dr. Mohan's October 2013 Psychiatric/ Psychological Impairment Questionnaire stated that Davis has "mild MR [mental retardation]" and identified the diagnostic test results, including the FSIQ of 65.  R. 685-86, 691.  Dr. Mohan's progress notes during 2014 continued to note her diagnosis of mild mental retardation.  R. 805-08.  In an updated opinion letter dated February 10, 2015, Dr. Mohan summarized her clinical findings, opined that Davis's low intellectual functioning began at birth, stated that his current GAF score was between 35 and 40, and found that Davis was "markedly limited"

7

in many areas of functioning.  R. 809.  Dr. Mohan's opinion regarding Davis's marked functional limitations reflects her diagnosis of mild mental retardation.[4]

In dismissing Dr. Mohan's mild mental retardation diagnosis – and by extension, her opinion that Davis has marked limitations in adaptive functioning – the ALJ also relied on the fact that Dr. Hamberg said "borderline intellectual functioning" [R. 819] rather than "mild mental retardation."  The ALJ stated, "Though the WAIS-IV scores were low, the psychologist [Dr. Hamberg] diagnosed borderline intellectual functioning."  R. 24.[5]  The ALJ also appeared to be referring to the following comment by Dr. Hamberg: "Though [Davis's] FSIQ score is in the extremely low range for intellectual functioning, his GAI score, which is in the borderline range, is likely a better indicator of his level of functioning."  R. 819.

However, Dr. Mohan is the treating psychiatrist and was entitled to make her own diagnosis of Davis's general intellectual functioning based on the test results, including the FSIQ of 65, and to reach her own conclusions and opinions regarding Davis's limitations in adaptive functioning.  Moreover, as stated above, the SSA has identified FSIQ as the "most reliable evidence that a person has intellectual disability."  The SSA

---

[4]  The DSM-IV criteria for diagnosing mental retardation are significantly subaverage intellectual functioning with an IQ of approximately 70 or below; significant deficits or impairments in adaptive functioning in certain enumerated areas; and onset before age 18. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.  DSM-5 (2013) adopts the term "intellectual disability" rather than "mental retardation" and removes IQ score from the diagnostic criteria.  An IQ score remains part of the revised Listing 12.05 (effective in 2017) unless a claimant is cognitively unable to participate in standardized IQ testing.

[5]  *Cheatum v. Astrue*, 338 F. App'x 574, 577 (8th Cir. 2010) (per curiam), which involved a diagnosis of borderline intellectual functioning, is not persuasive here.  *See* Cmn'r Br. 9, Docket No. 19.  The description of that claimant's specific adaptive functioning and employment history are not similar to the record in this case.

8

has rejected the position that a GAI [General Ability Index] score – which was cited by Dr. Hamberg – is a better indicator of intellectual functioning than FSIQ: "[T]he full scale IQ score contains more subtests (10) than the GAI (6), and therefore the full scale IQ score has higher and more stable reliability and validity coefficients. . . . [W]e do not agree with the recommendation to encourage adjudicators to use the GAI rather than the full scale IQ score as a summary measure of intelligence for listing 12.05." 81 Fed. Reg. at 66,151-52.

A formal mental retardation diagnosis is not a requirement of Listing 12.05.  *See Maresh*, 438 F.3d at 899.  Listing 12.05 links subaverage intellectual functioning to deficits in adaptive functioning.  It stated (before it was revised effective 2017), "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22."  In this case, Dr. Mohan's mild mental retardation diagnosis reflects her opinion regarding Davis's level of intellectual functioning as well as his limitations in adaptive functioning.  The ALJ's error in discounting Dr. Mohan's diagnosis affected his evaluation of her opinion that Davis was "markedly limited" in several areas of adaptive functioning.

Second, the ALJ erred in discrediting Dr. Mohan's opinion as inconsistent with Davis's work history.  The ALJ stated that "the records . . . support that [Davis] was capable of working in skilled-type jobs, which supports that he does not have mild mental retardation." R. 24.  He stated that Davis "continued to work in construction and landscaping prior to his injury [2004 vehicle/bicycle accident], and also reported he worked at restaurants," citing Exhibit B2F for this proposition.  *Id.* However, Exhibit B2F consists of 140 pages of medical records from 2004 to 2011 [R. 360-499], and it

9

contains only a couple of sentences regarding Davis's apparently self-reported work in the construction and landscaping industries. Specifically, a physical therapist noted during a February 2011 office visit that Davis had "[c]hronic neck pain since being hit by a car when riding his bike in September of 2004." R. 474. The notes include the statements, "Unable to work due to his injury. Was working in construction and landscaping prior to his injury. Also worked in restaurants." R. 474-75. There is no other detail or description.

The only specific construction-related task or duty that the Court finds in the record is Davis's testimony that he carried heavy bundles when he briefly worked with his uncle "in roofing." See R. 78-80.[6]  Davis's duties as a restaurant busser were to

---

[6] Davis testified as follows at the March 3, 2015 hearing:
- Q: [Y]ou've had some jobs in the past in a restaurant and construction?
- A: Yes. . . . I did some roofing with my uncle. That was, like, back in '01 – '02 I do believe.

\* \* \*

- Q: And the job with your uncle is in construction?
- A: It was in roofing.
- Q: Roofing?
- A: Yes.
- Q: All right. Just in the summer time then or –
- A: Yeah.
- Q: Okay and were you doing the whole thing tear out and put the roof back on or –
- A: Yeah and bring bundles up and all the good – yep.
- Q: Did he use power equipment to get the – that stuff up with a ladder?
- A: Yeah, they did a couple of times, yes.
- Q: Okay but sometimes you had to carry bundles up?
- A: Yes.
- Q: Wow, that's heavy work?
- A: Hmm-hmm.
- Q: Yeah.
- A: That's before the '04 accident.

R. 78-80.

10

"clean tables" and "bring dishes."  R. 315.  Davis also testified that he had never had any job in which he worked full-time for three months or longer.  R. 75.

The record contains no evidence from treating or examining sources that evaluate or state that Davis was or is capable of "skilled-type" work, whether in construction or landscaping or otherwise.  The vocational consultant (Beverly Solyntjes) case analysis dated February 12, 2015 consists of a single statement:  "No SGA [substantial gainful activity] work history reported."  R. 351; *see also* May 23, 2013 agency SGA report (no SGA work).

The "Work Activity Report" filled out by Davis on May 23, 2013 does not include any landscaping or construction employment.  R. 283-95.  Davis lists part-time employment as a restaurant busser for which he earned $129 in May-June 1999; $1,366.63 in June-December 2001; $2,068.50 in June-December 2002; $735 in January-October 2003; and $446 in March-August 2004.  *Id.*[7]  He lists part-time employment as "cashier and food prep at McDonalds" from April-June 2005, but does not describe any duties or responsibilities or provide any total wage income for these months, and he states that he was fired because his "boss said I said I was going to break her neck."  R. 294, 309.[8]

---

[7] Regarding his busser job at one restaurant, Davis testified as follows:
   ALJ:  Three days a week?  How many weeks or months did you do that?
   CLMT: For about six months the first time and then they let me go and then –
   ALJ:  Okay.
   CLMT: – they – hired me back and I messed up again.
   ALJ:  Oh, okay, all right.

[8] Davis testified to a slightly different version:  "I was at McDonald's and I thought the lady there was – had the demons in her and I was conversating over the phone with my sister and I was – I just said, like, I'm going to, like, snap necks around here and then

11

A "Work History Report" filled out by Davis on June 20, 2013 lists only restaurant busser jobs. R. 311-21. The agency's September 2013 Disability Determination Explanation form lists the following job titles and dates: "busboy 07/2002 to 02/2003"; "busboy 05/01 to 09/01"; "busboy 06/1999 to 07/1999"; "cashier 04/2004 to 05/2004"; and "roofer/landscape freelance wo 06/2005 to 08/31/2005." R. 111-12, 145, 159.

Dr. Mohan and Dr. Warner each mentioned Davis's past employment in passing in their reports, but without any description of job duties or any level of detail.[9] In summary, the references to construction, roofing and landscaping are cursory at best. The overall record does not support the ALJ's statement that Davis's past work history shows that he was capable of performing "skilled-type jobs" and that his job history was thus inconsistent with a diagnosis of mild mental retardation. Therefore, the ALJ erred in relying on this as grounds to reject Dr. Mohan's opinion that Davis has marked limitations in adaptive functioning.

Third, the ALJ stated that he gave "little weight" to Dr. Mohan's findings that Davis was "markedly limited" in numerous vocational areas because they were inconsistent with the Global Assessment of Function (GAF) score of 65. R. 24-25. The ALJ cited to Exhibit B10F [R. 684-92] and stated: "[Dr. Mohan] assessed a Global

---

she overheard that and then she overheard that and then the boss came in and fired me, let me go because of that." R. 86.

[9] Dr. Mohan's initial psychiatric evaluation of Davis as a new patient on July 30, 2012 includes a notation that "in the past [he] has worked in a restaurant and construction, etc." but contains no other details. R. 567. Dr. Warner's August 27, 2013 report notes, "Currently, [Davis] is unemployed. Most recent employment ran between 2004 and 2005 when he did roofing work on an intermittent basis over the course of that year. Longest held position lasted for six months, but he did not disclose any further information regarding that specific job." R. 663. The report contains no other detail or description; it also is inconsistent with the "roofing" time frame mentioned elsewhere in the record, and it is not clear which time frame is correct.

12

Assessment of Functioning score of 65, consistent with only mild symptomatology. The psychiatrist opined that the claimant had marked limitations . . . ." However, Exhibit B10F is Dr. Mohan's October 2013 report, and it stated a GAF score of 35-40, not 65. R. 685. Dr. Mohan's February 2015 report also stated a GAF of 35-40. R. 809. In addition, Dr. Hamberg – who administered numerous tests to Davis in August 2012 upon a referral from Dr. Mohan – assessed a GAF of 30. R. 819. It is not clear to the Court which record has the 65 GAF score to which the ALJ referred.

The ALJ dismissed Dr. Hamberg's GAF score of 30 by stating, "The undersigned finds that the claimant was not receiving consistent treatment at the time of this evaluation [August 2012], as he was in 2010 and 2011." R. 24. However, Davis had been treated by Dr. Mohan for two and a half years at the time she assessed a GAF of 35-40 in February 2015 [R. 809] – a score in the same range as her October 2013 report and Dr. Hamberg's August 2012 report. The ALJ's own opinion identifies several records in which Davis has a GAF score much lower than the 65 he cited. In addition, the SSA has stated that GAF scores do "not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed.Reg. 50746, 50764-65 (Aug. 21, 2000). The ALJ's selective use of GAF scores and reliance on them to reject Dr. Mohan's GAF scores and her opinion regarding Davis's marked functional limitations are not supported by substantial evidence in the record.

### c. Davis's Hallucinations

The ALJ made factual errors in discounting Davis's credibility regarding his testimony that he was not completely honest with the consulting examiner, psychologist

Dr. Warner, about his hallucinations because he does not want people to think he is "nuts" or a "bad person." *See* R. 82-85. The ALJ stated:

> The claimant testified that he heard voices and the demons kept him up at night and this caused difficulty sleeping. The voices said they would kill him and burn him. He also had visual hallucinations. He thought the FBI was following him and he saw them everywhere. He stated he was not quite honest at the consultative exam because he did not want people think he was a bad person.
>
> * * *
>
> The undersigned finds that the evidence supports the claimant's medications helped his symptoms significantly, contrary to the claimant's testimony. **With medication, the claimant reported no visual hallucinations which is also inconsistent with his testimony.** The claimant testified that he was not honest at the consultative exam, but the undersigned finds this to be less than fully credible and finds this detracts from the claimant's overall credibility.

R. 22 (emphasis added).

The record does not support the ALJ's statement that, with medication, Davis reported no visual hallucinations. Therefore, this factual inaccuracy cannot support the ALJ's decision to discount Davis's testimony that he does in fact have visual and auditory hallucinations even though he did not share them with Dr. Warner at the August 2013 consultative examination. Dr. Warner's report contains a single sentence about hallucinations: "There were no hallucinations voiced." R. 664. However, Davis's treatment records and other records contain many references to hallucinations, both before and after the date of the consultative examination with Dr. Warner. Specifically, the record shows that Davis continued to report visual hallucinations even with medication.

For example, Dr. Mohan's July 23, 2013 progress note listed his current psychiatric medications and stated, "[Davis] has a lot of symptoms in different

14

categories including hallucinations." R. 726-27. Her Psychiatric/Psychological Impairment Questionnaire dated October 15, 2013 indicated Davis has "[d]elusions or hallucinations" and, in response to the question "Which of the above clinical finding/symptoms are the more frequent and/or severe?", Dr. Mohan included "[h]allucinations" in her answer. R. 686-87. Her March 10, 2014 progress note listed his current psychiatric medications and stated, "[Davis] returns here for medication management" and "Even though he admits to symptoms of psychosis, he is able to handle them better." R. 808. Her June 10, 2014 progress note listed his medications and said, "Brian returns here for medication management. He certainly is not doing well. . . . He continues to hear voices" and "He continues to have some psychotic symptoms such as hallucinations, visual and auditory." R. 807. Her July 24, 2014 progress note listed his medications and stated that "Brian returns here for medication management. . . . [H]e seems to be doing better as far as the hallucinations are concerned." R. 806. Her October 24, 2014 progress note listed his medications and stated, "Brian returns here for medication management. He continues to struggle with some hallucinations" and "Continues to admit to hallucinations, especially auditory and visual." R. 805. Dr. Mohan's February 10, 2015 opinion included "delusions or hallucinations" among her clinical findings. R. 809.

The record shows that, even with medication, Davis continued to report visual hallucinations, even though the medication helped. Therefore, the ALJ was incorrect in stating that "[w]ith medication, the claimant reported no visual hallucinations which is also inconsistent with his testimony" [R. 22] and the ALJ erred in discounting Davis's "overall credibility" on this basis.

**4.     CONCLUSION**

The ALJ erred in not considering Listing 12.05.  The record also does not support the ALJ's decision to give little weight to treating psychiatrist Dr. Mohan's opinions and great weight to the opinions of the consulting examining psychologist and the non-examining agency reviewers, and to discount Davis's overall credibility as discussed above.  The Court remands this case to the ALJ to consider Listing 12.05 at step three and, if Davis is found not disabled at step three, to reconsider the RFC determination and the step five analysis in light of the overall record, giving appropriate weight to the opinion evidence.

**ORDER**

Based on the foregoing and all the files, records and submissions, IT IS HEREBY ORDERED THAT:

1.     Davis's Motion for Summary Judgment [Docket No. 14] is GRANTED. The case is remanded to the Administrative Law Judge for further consideration consistent with this opinion.

2.     The Commissioner's Motion for Summary Judgment [Docket No. 18] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 23, 2018

*s/ David T. Schultz*
DAVID T. SCHULTZ
United States Magistrate Judge